PHEBE S. RYNDERS *v.* JOHN J. CRANE AND ANOTHER, EXECUTORS OF THE WILL &c., OF WILLIAM E. BURTON, DECEASED.

The statutes of 1848 and 1849, in relation to married women, did not alter the common law rule, invalidating direct gifts from husband to wife.

But where the conveyance is made to the wife by a third person, for a consideration paid by the husband, the courts will not, except on the application of a creditor of the husband, question the wife's title. Still less will the third person who made the conveyance, be permitted to question the wife's title so far as it depends upon the consideration flowing from her to her husband.

Where a husband procured promissory notes, to be made to his wife by a third person, on a consideration paid by himself *held* that the wife might maintain an action on the notes against the maker, in her individual name.

A corrupt and illegal agreement, made between the husband and the maker of the notes, subsequently to their execution and delivery, but to which the wife was neither a party or privy, by which the husband was, as a part of the consideration, for the agreement on his part, to give up the notes in question, will not affect the wife's right of action on the notes.

APPEAL by the defendants, from a judgment entered on the verdict of a jury, at trial term.

The action was brought by the plaintiff, the wife of Isaiah Rynders, on two promissory notes, dated May 1, 1869, made by one William E. Burton, each for the sum of two thousand dollars, without interest, payable to the order of the plaintiff, one note being made payable two years, and the other four years after date.

The defenses set up were (1) the coverture of the plaintiff; that the notes in suit formed no part of her separate property, and that her husband was a necessary party plaintiff. (2) That the only consideration of the notes, if any, were certain illegal services alleged to have been rendered by Isaiah Rynders, with reference to the leasing and purchasing by the United States, of certain real estate in Chambers Street, belonging to Burton,

in which the United States Courts were held, Rynders being at the time United States Marshal, and one of the officers of those Courts.

It appeared on the trial, that Burton had been in the habit of borrowing money from Rynders, for which due bills were taken by Rynders; that in the autumn of 1858, the amount of those due bills was about $3,000, that at that time Burton and Rynders had a meeting in Baltimore, which resulted in Burton's giving Rynders the notes in suit, and at the same time entering into the following agreement with him :—

"It is hereby agreed that if the property in Chambers street, New York, known as 'Burton's Theatre,' and now occupied as U. S. Court Rooms, be purchased by the U. S. Government, by or before the term limited in the agreement, being three years from the first day of May, 1858, at the sum of two hundred and fifteen thousand dollars, that Isaiah Rynders, U. S. Marshal, shall receive the sum of Fifteen Thousand Dollars out of the purchase money, on condition that he resigns the notes he now holds, and dated May 1st, 1859, for two thousand dollars, at twenty-four months after date, payable to Mrs. Rynders, or order, and another of the same date, at forty-eight months after date, for same sum, payable to same party, and also allow one thousand dollars to be deducted from same sum of fifteen thousand dollars, as cash paid, besides the two notes above stated.

Nov. 26, 1858. ·            ·            W. E. BURTON.

A witness testified to an interview with Burton, in the spring or summer of 1859, in which Burton stated that he had settled all his accounts with Rynders, and that he gave him two notes, one for two years, and one for four years, for the amount, that he had given them to Mr. Rynders, in favor of Mrs. Rynders, for the due bills, and in settlement of all their money transactions, and as an inducement to Mr. Rynders to get passed the bill for the sale of the property, and also, that he thought it would be a very good thing for Mr. Rynders, for he thought he would go out of office without a dollar.

Another witness also gave evidence for the plaintiff, to the

effect that Burton had money transactions with Rynders prior to the autumn of 1858, the gross amount of which was two or three thousand dollars.

The plaintiff testified to the effect, that she had given no consideration for the notes, that her husband made her a present of them, and that they had always been in his possession, with the exception of a few days, during which they had been in a bureau drawer in their house.

The counsel for the defendants moved to dismiss the complaint, on the ground, (1,) that the plaintiff suing alone, could not maintain the action; and (2,) that the notes were connected with, and tainted by, the illegal contract with Mr. Rynders, the same forming a part of the consideration of the notes, or a part of the inducement that caused the making of the notes.

The Court denied the motion, to which the defendant excepted.

The Court charged the jury as follows:—

There are but two practical questions in this case: one, whether the action can be maintained in the name of Mrs. Rynders, to whom the notes in the suit are made payable, and the other, whether the notes were given for money loaned. The notes are drawn and payable one for two years, and the other for four years. Whether they embrace the amount of the money claimed to be loaned, with legal interest from the time they were payable, or whether they were given in whole, or in part, for services rendered, or to be rendered, by Mr. Rynders, in obtaining the passage of an Act of Congress for the purchase of certain premises in Chambers Street, to be used for government purposes, and which were used subsequently for the United States Court rooms, are the questions to be considered. The first question is chiefly a question of law, the solution of which depends upon the nature of the transfer of the notes to Mrs. Rynders; but before adverting to it, it might be proper that I should say to you, that the law in respect to married

women has undergone, especially in this state, a very material
change. For several centuries, the law upon this subject, in this
country and in England, was in marked contrast with the law
of every other portion of the civilized world. By what is
called the common law, all that a wife possessed before her
marriage became the property of her husband—in common
parlance, "what was hers, was her husband's, and what was
his, was his own;" she could possess nothing, and could trans-
fer nothing during her life time, nor could she bequeath any-
thing at her death. This law would have been abrogated
long ago, if means had not been discovered to mitigate its
injustice. The hardships of it were particularly felt in cases
where the husband was tyrannical, improvident or worthless,
and it frequently presented spectacles like that of the cele-
brated Lord Byron, who abandoned his wife and family, and
lived in a state of adultery with a woman of title, on the
avails of his wife's personal and real property, which the law
of England gave him. The moral sense of the community,
especially in this State, rose up against this injustice, and it
led to the passage of several enabling statutes, which placed,
in a very great degree, the wife's separate property under her
own control, as it is in the nations of Europe except England.

At a comparatively early period, provisions were made to
evade the oppression of the common law, and one of them
was the creation of what was called a "separate use to the
wife." A certain branch of the administration of the law in
Chancery and the Courts of equity, recognized the propriety
of settlements made by parents upon their daughters, in what
was called "marriage settlements," and enforced such settle-
ments strictly upon the husband; and afterwards, they recog-
nized the property given in marriage for the wife's separ-
ate use, whether the property was real or personal, in the
hands of a trustee; and finally, they came to the conclu-
sion, that property might be transferred in this way to the
wife's separate use, without a trustee, and without writing.
Such was the condition of the law, when the statutes to which
I have referred were passed. The second of these statutes

Rynders v. Crane.

was passed in the year 1849, by which the right of married women to take property, real or personal, by inheritance or by gift, was expressly provided for; and afterwards, in the years 1860 and 1862, this law was very much enlarged.

The transaction which we have under consideration, occurred in the year 1858, and is therefore governed by the law as it then stood ; and as the law then stood, a promissory note, drawn payable to a married woman, could, if it were to be transferred afterwards, be transferred, not by the endorsement of the woman herself, but by the endorsement of her husband.    This was expressly held in a well known English case.    If it were to be · prosecuted, and an action brought for the recovery of it, the action could be brought only in the name of the husband and wife conjointly.    The law in this respect was changed in this State, and provisions made, that in all actions relating to the wife's separate property, an action might be brought in the name of the wife alone, without joining the husband, trustee, or any other person.

In this case, the facts stated in respect to those notes, so far as regards the right of Mrs. Rynders to them, show that they were given for money loaned by Mr. Rynders, at various periods, to Mr. Burton, and prior to the time of making those notes, and also, that when they were made, there were suggestions made by Mr. Burton, that Mr. Rynders, probably, would go out of office without anything, and that it might be desirable to make the notes payable to Mrs. Rynders, and payable at a long period—at all events, beyond the period of his continnance in office.    To this, Mr. Rynders assented, which was virtually transferring the property in the notes to Mrs. Rynders, and the notes were made payable to her.    This coincides with a case decided by Baron Parke, which was an action upon a promissory note made to a wife.    " A promissory note," he said, "is not a personal chattel in possession, but a chose in action, of a peculiar nature, which may be transferred according to the custom of merchants ; when a chose in action as well as a promissory note is given to the wife, the husband may elect to let the wife have the benefit of it."    The question arose in this case, after the wife's death, whether the husband could sue upon the note, and

the court held that he could not, that it was a chose in action; that it had never been reduced by him to possession, by the husband, and that the wife having died, and he could not maintain an action upon the note.

In this particular case, there is, in my judgment, nothing in the law which precludes a transfer of this note to Mrs. Rynders. There are no persons that can be interested, unless it should be creditors. If Mr. Rynders, at the time, was insolvent, of course the transfer would not be good as against his creditors, but where nothing of that kind exists, I know nothing in the law to prevent a husband from transferring property by gift, or otherwise, to his wife.

The whole question in the case, is whether it was a transfer of this nature.

Burton, it is claimed, owed Rynders a certain sum of money, for which he had agreed to give Rynders obligations promising to pay it in several sums at expressed periods, and instead of making the notes payable to Mr. Rynders, it was agreed to make them payable to Mrs. Rynders, and vest the property in her, as her separate property.

It then became a chose in action, and there can be no question as to the right of Mrs. Rynders to maintain an action in her own name, the moment it becomes a part of her separate estate. The only question for you to pass upon, is the intention of the parties—whether their intention was to transfer the notes to Mrs. Rynders; and the only point of difficulty on that question is, that the notes were afterwards handed back by Mrs. Rynders, to her husband, and placed by him in the safe in his office. I will leave the whole question to you, as a matter of fact, to say what the intention of the parties was as regards this transfer. If you should arrive at the conclusion that the notes were transferred without any collusion, then I know of no law which would prevent the plaintiff from suing in her own name.

It is stated that there were various loans made by Mr. Rynders to Mr. Burton, during the life-time of the latter, which, according to the statement of the principal witness, Mr. Thompson, amounted to something over $3,000 dollars—the precise

amount he was unable to recollect, the due bills not being in existence. I do not propose to go over the evidence as detailed by the witness, both on his direct and cross-examination. It was given with considerable minuteness and particularity.

I am requested to say, in respect to that species of evidence, what the law is. It has been said by judges, commentators and writers on the law, that evidence of admissions or confessions given in the course of conversation are very unsafe, for the reason that such evidence may be easily fabricated, and difficult to contradict where the person who made the confession or admission is, as in this case, dead. It is subject moreover, as all evidence of this character must be, to the possibility of misconception on the part of the person to whom the conversation was addressed. It is not an unfrequent occurrence, when two parties are examined in respect to a conversation, that a material difference exists between them as to what was said, or their understanding of it. I shall only say to you, that in regard to testimony of this kind, you must judge from your own impression of the witnesses. It would not be proper that I should say anything further upon the subject—twelve men are much more competent to form a correct conclusion in such a matter than one could be. I leave the question entirely to you to determine.

As to this contract of Mr. Burton's, promising to pay to Mr. Rynders $15,000, if an Act of Congress should be passed for the purchase of the premises in Chambers Street, at the sum of $215,000, is wholly void. If these notes depended at all upon the validity of that contract, in whole or in part, the plaintiff cannot recover, and Mr. Rynders will be compelled to sue upon the original consideration.

I was asked by counsel to charge, that as matter of law, there can be no recovery on the notes, because they were made under the contemplation of an illegal contingency which did not happen. I decline to do so.

Exceptions were taken to portions of the charge. The jury rendered a verdict for the plaintiff, for the amount of the notes, and interest.

---

. The defendants appealed from the judgment entered on the verdict.

*Cram & Robinson,* for appellants.

*Holmes & McKeag,* and *Luther R. Marsh,* for respondent.

By THE COURT.*—JOSEPH F. DALY, J.—The question first to be considered in this case, is whether Mrs. Rynders can maintain this action without joining her husband as plaintiff, or waiting until she obtained title to the notes by his death. Her husband, Isaiah Rynders, by giving certain considerations to Wm. E. Burton, procured Burton to execute to the order of Mrs. Rynders two negotiable promissory notes, dated May 1, 1859, each for $2,000, without interest, one payable two years and the other four years after date. Burton delivered these two notes to Mr. Rynders, who took them and gave them to his wife, saying "there was a present for her," and she thanked him.

After the death of Burton, she indorsed the notes to have them sued upon, at the request of her husband, and delivered them to him for that purpose. She stated that she gave no consideration for the notes, but also states that she gave to her husband a portion of the patrimony received by her several years before. The parties were married in 1854, and the notes of Burton were procured and delivered to her in 1859.

This action was commenced in 1863.

At common law, the plaintiff would have had no right of action. Even though Burton had made the notes payable to Mrs. Rynder's order, and her husband had delivered them to her, he had the right to repossess himself of them, to receive payment of them and to sue for and collect them from the maker. His gift of them to his wife conferred on her no right of which he could not divest her at will during his life-time, and, only upon his death would the right of action ensue to her.

---

* Present, Loew, Larremore and J. F. Daly, J. J.

This rule has been settled beyond dispute. (*Gates* v. *Madeley*, 6 Mees. & Welsby, 425.)

The husband could not procure any conveyance to his wife of personal property which he could not immediately afterwards reduce to his own possession, and no declarations or acts of his could confer on her more than the right of survivorship. The Act of 1848, however, prevented the husband possessing himself of property belonging to his wife, and the act of 1849 prevented his possessing himself, by marital right, of any property she might acquire by gift from any person save himself. So far as direct gifts from husband to wife are concerned, the common law is unaltered.

A husband cannot make direct conveyance to his wife except under the terms of the statute. But where a third person conveys to the wife, the Statutes of 1848 and 1849 vest the property in her without question.

It may be that where the consideration of such conveyance is paid by the husband, the interposition of a third person is a device to make the laws of 1848 and 1849 operative and escape the common law disability.

But this question the Courts will never inquire into save on the application of a creditor of the husband; no other person, still less the very third party who made the conveyance or his personal representatives, will be permitted to question the title of the wife so far as it depends upon the consideration flowing from her to her husband.

In this case the notes in suit are not to be deemed a gift from Mr. Rynders to Mrs. Rynders in the view of the common law, but are to be considered as a conveyance to Mrs. Rynders from Burton, or rather a contract between her and Burton in which the husband has no concern. Mr. Rynders had a right to make over a consideration to Burton to induce the latter to enter into an obligation with a third party, and that this third party is the wife of Rynders does not affect the liability of Burton in his contract: his contract is with the wife alone; he is liable to her alone, and his rights are fully protected by an adjudication in the action brought by her. It is now impossi-

ble for Mr. Rynders to pursue Mr. Burton's estate for any debt which formed the consideration of these notes, even if the right of action continued in Rynders notwithstanding the notes, since the Statute of limitations would prevent such an attempt, and it is difficult to see what wrong can be done by suffering the action in its present shape to proceed.

The only valid plea of the defendants to this action is the validity of the consideration of the notes as between Burton and Mr. Rynders. The defendants claim that the notes are void because they are mentioned in the illegal agreement made by Burton and dated Nov. 26, 1858. They do not appear to be any part of the consideration of that agreement. If that corrupt agreement were carried out it would appear that Rynders and not Burton was to pay the notes. Burton had made the notes to Mrs. Rynders and was *prima facie* liable upon them. He then agrees to pay Rynders $15,000 on a corrupt consideration; but this $15,000 was not to be paid unless Rynders should resign these two notes.

They were the wife's property, and the presumption must be that Rynders in order to get them, to deliver up to Burton must purchase the notes from his wife, and this before the last one was due. This corrupt agreement does not on its face affect the wife. She holds a claim against Burton, and the latter enters into an illegal bargain whereby Rynders is to pay them.

She is not a party nor privy to this bargain; whether it holds, or not, she has her claim against the maker providing there is a good consideration to sustain them. The defendants then introduce testimony of the declarations of Burton to a third party (Burton being dead at the time of the trial) to show that these notes were given by him to Rynders as part of the corrupt bargain which resulted in the illegal agreement of Nov. 26, 1858; the plaintiff introduces testimony to show that, wholly apart from that bargain, Burton was before Nov. 26, 1858, indebted to Rynders in about $3,000, for borrowed money for which due bills were held by Rynders. Burton went to Baltimore with an enclosure for Rynders containing the due bills to meet Rynders and effect a settlement with the latter, and in the spring or summer of 1859 Rynders returned with the notes.

The whole testimony was sufficient to warrant a finding that the settlement was concluded on the basis of giving the notes for the due bills : Burton said it was so, and the long time the notes were to run, taken with the uncertainty as to the amount of interest then accrued on the due bills, added to the legal interest which was included in the notes for the time they were to run, might have properly made up the full face of the notes. The question was one of fact and was wholly left to the jury by the exceedingly full and fair charge of Chief Justice Daly, who presided at the trial. .

The jury found for the plaintiff, and the evidence was sufficient to warrant the verdict.    This disposes of the case.    The judgment should be affirmed.

Judgment affirmed.